

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 13-01918 |
| | Chapter 7 |
| KEITH CLIFFORD COCKETT, | |
| Debtor. | |
| | |
| DENNIS HASHIMOTO and | Adv. Pro. No. 14-90020 |
| JESSICA HASHIMOTO, | |
| Plaintiffs, | |
| vs. | |
| KEITH CLIFFORD COCKETT, | |
| Defendant. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial of this adversary proceeding was held on May 4-6, 2015. Christopher Muzzi represented the plaintiffs, and Michele-Lynn Luke and Dawn Egusa represented the defendant.

Based on the evidence received, the court makes the following

## FINDINGS OF FACT:

### I. The Parties and the Contracts

1. Plaintiffs Dennis Hashimoto and Jessica Hashimoto own the property located at 1005 Hoa Street, Honolulu, Hawaii.

2. Keith C. Cockett ("Mr. Cockett") is an architect who has been licensed in California since 1995 and in Hawaii since 1996. Mr. Cockett is the president of Keith Cockett & Associates, Inc., a Hawaii corporation ("KCA").

3. The Hashimotos wanted to build a custom home on their property. The Hashimotos sought the services of KCA to assist them because Mr. Cockett and Mr. Hashimoto had worked on projects together (Mr. Hashimoto is a licensed surveyor) and the Hashimotos had a positive impression of Mr. Cockett and KCA's projects.

4. On November 12, 2004, Mr. Cockett provided to Mrs. Hashimoto a letter and proposal for services for the Hashimotos' project. The proposal provided that KCA's services would include "[p]eriodic observation of the construction to ensure compliance with the Construction Documents" and that the scope of work included "[p]eriodic site visits (usually once a week)."

5. On April 24, 2005, KCA and the Hashimotos entered into a contract for KCA's work, using AIA Document B151-1997.

6. The AIA Agreement governs the scope of KCA's services. It provides that

2

KCA would prepare "Schematic Design Documents," "Design Development Documents," and "Construction Documents," and would provide administration of the "Contract for Construction."

7.      Section 2.6.5 of the AIA Agreement provided that KCA was required to "visit the site at intervals appropriate to the stage of the Contractor's operations . . . to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed . . . ." Section 2.6.5 also provided that "the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work."

8.      Section 2.6.6 of the AIA Agreement provided that "The Architect shall report to the Owner known deviations from the Contract Documents . . . ."

9.      Section 2.6.5 of the AIA Agreement provided that "The Architect shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents."

10.     Section 2.6.6 of the AIA Agreement provided that "the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents."  Section 2.6.6 also provided that, "The Architect . . . shall not have control over or charge of and shall not be responsible

3

for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work."

11.　　By November 10, 2006, KCA had completed architectural plans for the Hashimotos' new home. Mrs. Hashimoto was very pleased with the plans.

12.　　The Hashimotos retained Xiang Yee of IMH Engineering, at the recommendation of a relative, to prepare the structural plans for their new home. The Hashimotos entered into a written contract with IMH Engineering, under which IMH Engineering was obligated to provide structural drawings, conduct certain inspections during the construction phase, and provide appropriate certifications to the Department of Planning and Permitting.

13.　　Mr. Yee generated the structural plans after KCA prepared the architectural plans.

14.　　A friend referred the Hashimotos to David Evans, whose company, Evans Construction LLC ("EC"), was a building contractor. At that time, Mr. Cockett did not know Mr. Evans and was not familiar with EC.

15.　　On November 25, 2008, the Hashimotos entered into a Construction Contract with EC. Mr. Cockett helped the Hashimotos negotiate the contract.

16.　　Mrs. Hashimoto was extensively involved in all aspects of the design and construction of the new home. During the construction phase, she (and sometimes her husband) met at least weekly with Mr. Cockett and Mr. Evans.  At the weekly

4

meetings, the Hashimotos, Mr. Evans, and Mr. Cockett walked through the areas of the property that had been subject to work in the prior week and discussed the progress of the work. Mrs. Hashimoto also sent emails almost daily to Mr. Cockett and Mr. Evans about the project. Thus, the Hashimotos had opportunities to raise, and did in fact raise, any concerns or questions they had regarding the project. Mr. Cockett attempted to respond to all of these questions and concerns (although Mrs. Hashimoto did not find all of his responses satisfactory).

17.    Mr. Cockett satisfied KCA's duty to monitor and inform the Hashimotos about the progress of the job.

## II.    Changes to Plans

18.    During the construction phase, the architectural plans were changed in several respects. These changes included (among others) the following:

    a.    The relocation of and addition of a wraparound deck on the cabana, and related changes to the grading of the site and rock walls.

    b.    The addition of an outside bathroom.

    c.    The relocation of the electrical meter and box.

    d.    The deletion of certain strip drains.

19.    No formal written change orders were prepared, contrary to the AIA Agreement. Both parties agreed, at least tacitly, to forego some of the formalities required by the AIA Agreement. Mr. Cockett honestly believed that the Hashimotos

5

were not insisting on compliance with all of the formal and procedural requirements of the AIA Agreement. His failure to comply strictly with those requirements was not intended to defraud or mislead the Hashimotos.

20.     Mr. Cockett discussed all of the changes to the plans with the Hashimotos. Mr. Cockett honestly believed that the Hashimotos had approved all of the changes that were implemented and that the changes were in the Hashimotos' best interest. Mr. Cockett did not make any misrepresentations to the Hashimotos about the changes to the plans, did not intentionally withhold any information from the Hashimotos about them, and did not intend to deceive the Hashimotos.

21.     Some of the changes should have resulted in corresponding changes in the contract price under the construction contract. Neither the Hashimotos nor Mr. Cockett consistently required that EC agree to a price change before implementing the work changes. Mr. Cockett honestly believed, based on industry custom and his experience with similar projects, that the price adjustments would be resolved after the construction was complete and as part of the final payment process.

III.   EC's Deficient Work

22.      In many respects, EC failed to construct the project in accordance with the architectural plans and specifications. For example:

        a.     The structural plans which Mr. Yee prepared (after KCA prepared the architectural plans) were inconsistent with the architectural plans. No one noticed

U.S. Bankruptcy Court - Hawaii   #14-90020   Dkt # 126   Filed  07/27/15   Page 6 of 22

the discrepancy until after EC framed the front of the house in the manner set forth in the structural plans, rather than the architectural plans. It then became apparent that the front of the house, particularly the entryway, could not be built in the manner set forth in the architectural plans unless the framing was redone.

      b.    EC and its subcontractor failed to construct the pool in accordance with a plan drawn by KCA.

      c.    EC may have constructed some of the rock walls in a structurally unsound manner.

      d.    EC did not correctly place and bury the sewer lines.

      e.    At least one of the steel beams which EC installed is notched, which potentially weakens the beam. There is a dispute about whether that particular notch is consistent with the structural plans.

      f.    In some cases, EC substituted inferior materials for those specified in the architectural plans and specifications.

23.    Mr. Cockett did not know, and had no reason to know, about the deficient work until after it was completed. He told the Hashimotos about the deficient work promptly after he learned about it.

24.    In most cases, EC accepted responsibility for the deficient work and promised to correct it but never completed the corrective work.

25.    Mr. Cockett did not make any false or deceptive statements to the

U.S. Bankruptcy Court - Hawaii   #14-90020   Dkt # 126   Filed  07/27/15   Page 7 of 22

Hashimotos about EC's deficient work and did not fail to disclose to the Hashimotos any relevant facts. He did not intend to deceive the Hashimotos in any respect.

## IV. The Roof Tiles

26. KCA's architectural plans specified Monier tiles for the roof. Later, Mr. Cockett and Mr. Evans showed tile samples to the Hashimotos, and the Hashimotos picked one of the presented tiles. None of the samples were manufactured by Monier, although all of them are the same type of material as Monier tiles. Mr. Cockett did not tell the Hashimotos that none of the sample tiles were manufactured by Monier. He honestly believed that the sample tiles satisfied the requirements of the architectural plans and he did not intend to deceive the Hashimotos.

## V. Licensure

27. There is a dispute about whether EC's contractor's license permitted it to do all of the work which it performed (such as the pool) and whether all of EC's subcontractors were properly licensed.

28. Mr. Cockett did not know at the time that EC or any of its subcontractors lacked any requisite licenses and honestly believed that it was not his responsibility to verify the licensure of EC and its subcontractors. Mr. Cockett did not make any false or misleading statements to the Hashimotos about the license issues and did not deliberately fail to disclose any relevant facts to the Hashimotos.

8

## VI.    Structural Inspections

29.    Under the Hashimotos' contract with IMH Engineering,  Mr. Yee was responsible for conducting certain inspections during the construction phase and for providing appropriate certifications to the Department of Planning and Permitting. KCA and Mr. Cockett had no such contractual responsibility.

30.    Before Mr. Yee inspected some of the structural work, EC closed the walls, making direct observation of the work impossible.

31.    There is a dispute about whether KCA or Mr. Cockett owed a duty to the Hashimotos to contact Mr. Yee and arrange for the special inspections before EC closed the walls. Assuming that KCA had a contractual duty to do so, the Hashimotos did not prove that Mr. Cockett made any false or deceptive statements to the Hashimotos about this topic or concealed any relevant information from them, that his failure was deliberate, that he intended to injure the Hashimotos, or that he knew his conduct was substantially certain to injure the Hashimotos.

32.    Later, after Mr. Yee refused to provide the required certificates, Mr. Cockett provided certificates of some (but not all) of the required special inspections. He provided these certificates because he believed he was competent to perform the inspections and honestly believed that the work had been done in conformity with the plans and applicable law. He honestly believed that his certificates were proper. He did not knowingly make any false or deceptive statement in this regard or fail to disclose

9

any relevant information.

## VII.   EC's Invoices

33.     EC sent all of its invoices directly to Mrs. Hashimoto.  Mr. Evans and Mrs. Hashimoto dealt directly with each other regarding any issues concerning money.

34.     Mrs. Hashimoto sent some or all of EC's invoices to Mr. Cockett for his review and approval.

35.     When Mr. Cockett approved (or did not express any objection to) the invoices, he honestly believed that the Hashimotos owed the invoiced amount to EC.

## VIII.  The Termination of the Contracts

36.     By July of 2010, the Hashimotos' relationship with Mr. Evans had become strained due to the deficiencies in EC's work.  During the summer of 2010, the Hashimotos told Mr. Cockett that they were considering hiring an independent construction representative named Arne LaPrade to look at the property, make observations, and identify potential issues.  Mr.  Cockett agreed that hiring Mr. LaPrade would be useful.

37.     Mr. Evans told Mrs. Hashimoto that he wanted to finish the house and requested a list of things the Hashimotos wanted him to do.

38.     After the Hashimotos retained Mr. LaPrade, he did a site inspection and walked through the property with Mr. Evans and Mr. Cockett.

39.     Mr. LaPrade generated a list of construction items that he thought

10

deviated from the construction plans. Mr. Cockett reviewed the list and provided annotations indicating his view of the status of each item.

40.     Mr. Evans met with the Hashimotos to address the issues on the list, and Mr. Cockett attempted to assist in the resolution of those issues.

41.     Mr. Cockett told Mrs. Hashimoto that it would be in their best interest to have Mr. Evans finish the project. Mr. Cockett explained that it is usually best for the owner to permit the contractor who has done a majority of the work to finish the job because such contractor could finish it faster and for less money than a new contractor could.

42.     The dispute between the Hashimotos and EC escalated. EC stopped work and eventually the construction contract was terminated.

43.     Mr. Cockett continued to work with the Hashimotos after construction had stopped and assisted the Hashimotos in obtaining proposals from other contractors to finish the job.  The Hashimotos eventually ceased all communications with Mr. Cockett and KCA.

44.     The project has never been completed.

## IX.   Mr. Cockett's Loyalty to the Hashimotos

45.     The Hashimotos argue that Mr. Cockett had a motive to favor EC's interest over theirs and slant his trial testimony to favor EC. After the Hashimotos entered into the contract with EC, Mr. Cockett invited EC to submit bids on other

U.S. Bankruptcy Court - Hawaii   #14-90020   Dkt # 126   Filed 07/27/15   Page 11 of 22

projects for which KCA was the architect. EC was the successful bidder on four of those projects. According to the Hashimotos, this meant that, if EC went out of business, the other projects would also have been in trouble and KCA's relationship with the owners of those projects would have been jeopardized. Therefore, argue the Hashimotos, Mr. Cockett had a motive to place EC's interests ahead of theirs and to distort his testimony at trial.

46.    I do not agree with this argument. I am convinced that Mr. Cockett believed he was acting in the Hashimotos' interest at all relevant times. I am not convinced that Mr. Cockett would be so foolish as to "sell out" one owner in an attempt to preserve his relationship with other owners. I find that Mr. Cockett's testimony at trial was credible, based on his demeanor, the plausibility of his version of the events, and the consistency between his testimony and the available documentary record.

47.    On a few (perhaps three) occasions, Mr. Cockett asked, in response to a comment from Mrs. Hashimoto, whether Mrs. Hashimoto wanted to put Mr. Evans out of business. This does not mean that Mr. Cockett placed Mr. Evans' interests over the Hashimotos'. Rather, Mr. Cockett used this rhetorical question (at least in part) to tell Mrs. Hashimoto that she was making demands with which EC could not comply, that if she persisted in those demands EC would be forced to abandon the project, and that if that happened, the Hashimotos would have to hire a replacement contractor,

12

which would substantially delay and dramatically increase the cost of the project. Mr. Cockett asked his rhetorical question in pointed terms because Mrs. Hashimoto became very angry about the project and Mr. Cockett was afraid that she might make rash decisions. Mr. Cockett wanted to get Mrs. Hashimoto's attention and remind her of the consequences of her choices. Mr. Cockett was not trying to protect EC. To the contrary, he was trying to prevent the Hashimotos from making bad decisions in the heat of anger.

## X.   Summary of Mr. Cockett's Intentions.

48.     Mr. Cockett never made any statements to the Hashimotos that he knew or should have known were false or deceptive.

49.     Mr. Cockett never engaged in any conduct that was likely to deceive the Hashimotos.

50.     Mr. Cockett fulfilled his duty to keep informed about the progress of the job and provide to the Hashimotos all facts relevant to the project as and when those facts became known to him.

51.     Mr. Cockett never intended to deceive or mislead the Hashimotos.

52.     Mr. Cockett never subjectively intended to injure the Hashimotos.

53.     Mr. Cockett never engaged in any conduct which he subjectively knew was substantially certain to injure the Hashimotos.

54.     Mr. Cockett always believed that he was acting in the Hashimotos' best

U.S. Bankruptcy Court - Hawaii   #14-90020   Dkt # 126   Filed  07/27/15   Page 13 of 22

interest.

## XI.   Production of Financial Records

55.    After Mr. Cockett filed his bankruptcy petition, the Hashimotos requested that he produce various documents, including: "Any and all documents relating to the value of Keith Cockett & Associates, Inc., including tax returns, financial statements, profit and loss statements, balance sheets, accounts payables lists, accounts receivables lists, and list of pending and completed engagements for calendar years 2011, 2012, 2013 and 2014."

56.    Mr. Cockett directed his accountant to gather the requested documents, and to his knowledge, his accountant did so. Mr. Cockett forwarded all of those documents to his counsel for production to the Hashimotos' counsel.

57.    KCA maintained its accounting records using QuickBooks software.

58.    By letter dated April 3, 2015, the Hashimotos' counsel informed Mr. Cockett's counsel that he still had not produced KCA's "financial statements, profit and loss statements, and balance sheets for 2011, 2012 and 2014" and "any accounts payables lists, accounts receivables lists, and list of pending and completed engagements for calendar years 2011, 2012, 2013 and 2014."   The Hashimotos requested the paper files as well as the QuickBooks electronic files.

59.    On April 9, 2015, Mr. Cockett's counsel produced paper copies of the requested Profit & Loss Statements and Balance Sheets, but not the electronic

14

QuickBooks files, and did not turn over paper copies or electronic files of any accounts payables lists, accounts receivables lists, and list of pending and completed engagements for calendar years 2011, 2012, 2013 and 2014.

60.     Although the record is less than perfectly clear, it appears that the electronic QuickBooks files include all of the information in Mr. Cockett's possession or control that the Hashimotos have requested and that Mr. Cockett has not already produced.

61.     Although Mr. Cockett testified that he turned over the electronic QuickBooks files to his attorneys, these files have not been turned over to the Hashimotos, and his attorneys have never explained why.

62.     Mr. Cockett has not deliberately destroyed any information about his business and has not failed to keep any records that a person in his position would ordinarily and reasonably keep.

Based on these findings of fact, I draw the following

## CONCLUSIONS OF LAW:

## I.     Jurisdiction and Venue

1.     The court has personal jurisdiction over the parties and jurisdiction of the subject matter. The bankruptcy court has statutory and constitutional power to enter a final judgment. Venue is proper in this district.

U.S. Bankruptcy Court - Hawaii   #14-90020   Dkt # 126   Filed  07/27/15   Page 15 of 22

II.    **Section 523(a)(2)**

A.    *In General*

2.    A chapter 7 discharge does not discharge an individual from any debt for money to the extent that the debtor obtained it by "false pretenses, a false representation, or actual fraud . . . ."[1] The plaintiff must prove five elements by a preponderance of the evidence:

(i)    Misrepresentation, fraudulent omission, or the debtor's deceptive conduct;

(ii)    Knowledge of the falsity or deceptiveness of his statement or conduct;

(iii)    An intent to deceive;

(iv)    Justifiable reliance by the creditor on the debtor's statement or conduct; and

(v)    Damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.[2]

3.    Exceptions to discharge must be strictly construed in favor of the debtor in order to effectuate the Code's goal of giving debtors a fresh start.[3]

4.    Under Hawaii law, when an officer, director, or shareholder of a

---

[1] 11 U.S.C. § 523(a)(2)(A).

[2] *Oney v. Weinberg (In re Weinberg),* 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009).

[3] *Caneva v. Sun Communities Operating Limited Partnership (In re Caneva),* 550 F.3d 755, 761 (9th Cir. 2008).

16

corporation actively or passively participates in wrongful conduct, he or she is "not shielded by the corporation and will be personally liable."[4] Accordingly, the limited liability feature of KCA does not protect Mr. Cockett from the consequences of his own conduct.

### B. Fraudulent Omission

5.     The plaintiff can establish that a debtor engaged in a fraudulent omission if he proves that, first, there was a duty to disclose a material fact; second, the debtor did not disclose that fact; and, third, the debtor's omission was motivated by an intent to deceive.[5]

6.     The Supreme Court has held that the common law in force when section 523 was passed and the Restatement (Second) of Torts should guide courts' interpretation of section 523(a)(2)(A).[6] Following that direction, the Ninth Circuit has relied on the Restatement when discussing the duty to disclose.[7]

7.     Section 551 of the Restatement explains that a party to a business

---

[4] *Eastern Star, Inc., v. Union Bldg. Materials Corp.*, 6 Haw. App. 125, 134-35, 712 P.2d 1148, 1155 (1985) (quoting *Burgess v. Arita*, 5 Haw. App. 581, 594, 704 P.2d 930, 939 (1985)).

[5] *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1089 (9th Cir. 1996); *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 n. 4 (9th Cir. 2001) ("A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and the debtor's omission was motivated by an intent to deceive.") (citing *Eashai*, 87 F.3d at 1089-90).

[6] *Field v. Mans*, 516 U.S. 59, 70 (1995); *Apte v. Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1323-24 (9th Cir. 1996).

[7] *Eashai*, 87 F.3d at 1089; *Apte*, 96 F.3d at 1323-24.

U.S. Bankruptcy Court - Hawaii  #14-90020  Dkt # 126  Filed  07/27/15  Page 17 of 22

transaction has a duty to disclose the following facts once the transaction is

consummated:

> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

## C.    *Section 523(a)(2) Applied To This Case*

8.    The Hashimotos did not prove that Mr. Cockett made any

representation to them that he knew or should have known was false or that he

engaged in any conduct that he knew or should have known would have deceived

them.

9.    As the Hashimotos' agent, KCA (and by extension Mr. Cockett) owed a

duty to disclose to the Hashimotos all facts known to Mr. Cockett that related to the

project. The Hashimotos did not prove that Mr. Cockett knowingly or intentionally

violated any duty to disclose information to them.

18

10.    The Hashimotos did not prove that Mr. Cockett knew that any of his statements were false, that any of his conduct was deceptive, or that he intended to deceive the Hashimotos.

## III.    Section 523(a)(6)

11.    A debt "for willful and malicious injury by the debtor" is also not dischargeable.[8] To prevail, the plaintiff must establish both willfulness and malice.

12.    An injury is "willful" if (1) "the debtor had a subjective motive to inflict the injury" or (2) "the debtor believed that injury was substantially certain to occur as a result of his conduct."[9] The touchstone of this standard is that the debtor must have intended to injure the creditor. It is not enough to prove that the debtor acted intentionally and caused an injury.[10]

13.    The Hashimotos did not prove that Mr. Cockett acted willfully. Mr. Cockett did not intend to injure the Hashimotos and did not subjectively believe that his conduct was substantially certain to injure the Hashimotos. To the contrary, Mr. Cockett believed he was acting in the Hashimotos' best interest at all times.

14.    To prove that the debtor acted maliciously, the creditor must show four elements: "'(1) a wrongful act, (2) done intentionally, (3) which necessarily causes

---

[8] 11 U.S.C. § 523(a)(6).

[9] *In re Jercich*, 238 F.3d 1202, 1208 (9th Cir. 2001).

[10] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

19

injury, and (4) is done without just cause or excuse.'"[11]

15.     Mr. Cockett did not intentionally commit any wrongful act that would necessarily have injured the Hashimotos. Therefore, the Hashimotos have not carried their burden of establishing that Mr. Cockett acted "maliciously" within the meaning of section 523(a)(6).

## IV.   Section 727(a)(3)

16.     The bankruptcy court must grant a discharge unless the debtor, or his agent, "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve" any records "from which the debtor's financial condition or business transactions might be ascertained," unless the act or "failure to act was justified under all of the circumstances of the case."[12]

17.     At a minimum, the plaintiff must show "'(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions.'"[13] The plaintiff has the burden to prove all the elements.[14]

---

[11] *Jerich*, 238 F.3d at 1209 (quoting *In re Bammer*, 131 F.3d 788, 791 (9th Cir.1997) (en banc)).

[12] 11 U.S.C. § 727(a)(3); 6-727 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 727.03[2] (16th ed. 2015).

[13] *In re Cox*, 41 F.3d 1294, 1296 (9th Cir. 1994) (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir. 1992)).

[14] Fed. R. Bankr. P. 4005.

U.S. Bankruptcy Court - Hawaii   #14-90020   Dkt # 126   Filed 07/27/15   Page 20 of 22

18.    There is no evidence that Mr. Cockett destroyed, mutilated, or falsified any information about his financial condition or business transactions.

19.    Some records may have been lost when Mr. Cockett's computer crashed a few years ago, but there is no indication that Mr. Cockett is at fault or that the lost records are important.

20.    Mr. Cockett kept and preserved all records which a reasonable person in his position would have kept. To the extent that he failed to "keep" other records, his failure was justified.

21.    The only records in existence which Mr. Cockett has not produced to the Hashimotos are his electronic QuickBooks files. Mr. Cockett testified that he turned the electronic files over to his counsel, but his counsel have not explained why they failed to produce those files to the Hashimotos.

22.    The Hashimotos argue that Mr. Cockett has "concealed" his electronic QuickBooks files. According to the dictionary, "concealment" is "[t]he act of preventing disclosure or refraining from disclosing," especially "the injurious or intentional suppression or nondisclosure of facts that one is obliged to reveal; cover-up."[15]

23.    Mr. Cockett has always acknowledged that the QuickBooks files exist and has not personally attempted to prevent their disclosure. His attorneys' failure to

---

[15] Black's Law Dictionary (10th ed. 2014), WestlawNext.

U.S. Bankruptcy Court - Hawaii   #14-90020   Dkt # 126   Filed 07/27/15   Page 21 of 22

turn the files over to the Hashimotos' counsel is unexplained but is probably the result of simple inadvertence.

24.   Mr. Cockett's counsel must promptly turn the QuickBooks files over to the Hashimotos' counsel. But the failure to do so to date is not sufficient to justify a denial of discharge under section 727(a)(3).

## CONCLUSION

Judgment shall enter in favor of Mr. Cockett and against the Hashimotos on all claims. Mr. Cockett's counsel shall submit a proposed form of judgment.

### END OF FINDINGS AND CONCLUSIONS

U.S. Bankruptcy Court - Hawaii   #14-90020   Dkt # 126   Filed  07/27/15   Page 22 of 22